IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:22CR490 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET M. BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| OBED SANCHEZ, | ) | <u>UNITED STATES' RESPONSE IN</u> |
| | ) | <u>OPPOSITION TO</u> |
| Defendant. | ) | <u>DEFENDANT'S MOTION TO DISMISS</u> |
| | ) | <u>INDICTMENT</u> |

Now comes the United States of America, by and through counsel, Rebecca C. Lutzko, United States Attorney, and Scott Zarzycki, Assistant United States Attorney, and respectfully submits this Opposition to the Defendant's Motion to Dismiss the Indictment.  For the reasons explained below, this Court should deny the motion.

## I.      INTRODUCTION

Defendant Obed Sanchez has a lengthy criminal history which includes 2 prior convictions for felonious assault, in violation of Ohio Rev. Code Section 2903.11(a)(2), and 1 conviction for burglary, in violation of Ohio Rev. Code Section 2911.12(A)(2).  As a result of his violent criminal history, Sanchez qualifies as an Armed Career Criminal under 18 U.S.C. Section 924(e).  Last year, while on parole, and despite his felonies and knowledge thereof, Sanchez illegally possessed a Taurus, model Armas G2C, .40 caliber semiautomatic pistol, bearing serial number ABK020323.  Sanchez now asks this Court to dismiss his one-count superseding

1

indictment for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), arguing that Section 922(g)(1) is unconstitutional.  This Court should deny Sanchez's motion.

This Court has already concluded that the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*") recognized limitations to the right secured by the second amendment and "that 'longstanding regulatory measures and prohibitions on the possession of firearms by felons...' are valid and constitutional." *United States v. Coleman*, WL 7704966 *4 (N.D. Ohio Nov. 15, 2023) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), see also *United States v. Norman*, 2023 WL 6290690, at *3 (N.D. Ohio Sept. 27, 2023).  Out of an abundance of caution and to preserve the record for any appeal, the government reiterates its arguments from those cases below.

It is true that the past fifteen years have produced significant developments in Second Amendment law, both in terms of the Amendment's scope and the standards of review governing claims invoking it.  But one thing has remained constant throughout.  Time and again, courts— including the Sixth Circuit—have held that "Congress's prohibition on felon possession of firearms" in statutes like Section 922(g)(1) "is constitutional."  *E.g.*, *United States v. Greeno*, 679 F.3d 510, 517 (6th Cir. 2012); *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010).

This makes sense, given the Supreme Court's consistent comments approving of felon-dispossession laws over that fifteen-year period.  In its seminal Second Amendment decision, *District of Columbia v. Heller*, the Court went out of its way to confirm that "nothing in [that] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which it described as "presumptively lawful."  554 U.S. 570, 626 & n.26 (2008).

And in each major Second Amendment decision since then, either the majority or at least multiple members of the Court have reiterated that point.  In *McDonald v. City of Chicago*, the principal opinion reminded litigants and lower courts that the Court had "made it clear in *Heller* that [its] holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'"  The principal opinion then "repeat[ed] those assurances." 561 U.S. 742, 786 (2010) (plurality op.).  Fast forward to three years ago.  When the Supreme Court concluded that its first Second Amendment case since *Heller* and *McDonald* had become moot because of intervening changes to state law, the only Justices to reach the merits reiterated that the Court had already "recognized that history supported the constitutionality of some laws limiting the right to possess  firearm, such as laws … prohibiting possession by felons and other dangerous individuals."  *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., dissenting, joined by Gorsuch & Thomas, JJ.) ("*NYSRPA*"); *see also id.* at 1527 (Kavanaugh, J., concurring) ("I also agree with Justice Alito's general analysis of *Heller* and *McDonald*.") (capitalization altered).

Some—including Sanchez—think that the Court's most recent Second Amendment case, issued last year, changed all that.  *See New York States Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*");[1] *see also* (ECF No. 43: Motion, PageID 226-27).

Not so.  That opinion itself referred over and over to the "*law-abiding*" citizen's right to bear arms for self-defense.  *See id.* at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156 (emphasis

---

[1]     More precisely, *Bruen* is the Supreme Court's most recent *decided* Second Amendment case.  The Court has also recently granted review of a post-*Bruen* decision from the Fifth Circuit invalidating a different federal firearms law, 18 U.S.C. § 922(g)(8), and a decision further clarifying the Court's Second Amendment caselaw can be expected by the end of the Court's upcoming term in summer 2024.  *See United States v. Rahimi*, No. 22-915 (U.S.).

added).  And various members of the Court—representing a majority of its current Justices— noted their views that *Bruen* did not disturb *Heller*'s and *McDonald*'s earlier statements about felon-dispossession laws.  *See id.* at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J.) (noting that *Heller*'s and *McDonald*'s statements approving felon-dispossession laws survive *Bruen*); *id.* at 2189 (Breyer, J., dissenting, joined by Sotomayor & Kagan, JJ.) ("Like Justice Kavanaugh, I understand the Court's opinion today to cast no doubt on … *Heller*'s holding" that felon-dispossession laws are "presumptively lawful") (capitalization altered).

In sum, "the Supreme Court has been *consistently* clear that its Second Amendment jurisprudence has cast no doubt on the validity of the prohibitions on the possession of firearms by convicted felons."  *United States v. Jordan*, No. 1:23CR159, 2023 WL 4267602, at *2 (N.D. Ohio June 29, 2023) (Adams, J.).

In the year since the Supreme Court issued its *Bruen* decision, district courts across the country have issued well over 100 decisions rejecting Second Amendment challenges to Section 922(g)(1).  *See* United States' Supplemental Submission, *United States v. Bullock*, No. 18CR165, Doc. 74, at 2-4 n.1 (S.D. Miss. April 11, 2023) (collecting more than 120 district court decisions, even as of five months ago, rejecting Second Amendment challenges to Section 922(g)(1)).  This includes several other judges in this district, and other district courts within the Sixth Circuit.  *E.g.*, *United States v. Gaither*, No. 3:23CR189, Doc. 28 (N.D. Ohio Oct. 5, 2023) (Knepp, J.); *United States v. Miller*, No. 1:22CR645, 2023 WL 6065116 (N.D. Ohio Sept. 18, 2023) (Brennan, J.); *United States v. Taylor*, No. 1:23CR289, 2023 WL 5957107 (N.D. Ohio Sept. 12, 2023) (Barker, J.); *United States v. Watson*, No. 5:23CR45, Doc. 24 (N.D. Ohio Sept. 6, 2023) (Gaughan, J.); *United States v. Ritz*, No. 3:22CR440, Doc. 23 (N.D. Ohio Aug. 4,

2023) (Zouhary, J.); *Jordan*, 2023 WL 4267602 (Adams, J.); *see also, e.g.*, *United States v. Nelson*, __ F. Supp. 3d __, 2023 WL 4249367, at *5 (E.D. Mich. June 29, 2023) (collecting cases); *United States v. Parker*, No. 3:22CR82, 2023 WL 3690247, at *2 (W.D. Ky. May 26, 2023) (collecting cases); *United States v. Davis*, Crim. No. 5:19-159, 2023 WL 373172, at *2 (E.D. Ky. Jan. 24, 2023).[2]

Similarly, the Eighth Circuit recently held that, "[g]iven these assurances from the Supreme Court, and the history that supports them, … there is no need for felony-by-felony litigation regarding the constitutionality of [Section] 922(g)(1)." *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023); *see also United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023) ("The longstanding prohibition on possession of firearms by felons is constitutional, and the district court properly denied the motion to dismiss" the indictment.).

First, the Sixth Circuit has held in multiple published cases since *Heller* that "Congress's prohibition on felon possession of firearms" in statutes like Section 922(g)(1) "is constitutional." *See, e.g, Greeno*, 679 F.3d at 517. *Bruen* did not call those holdings into question, because they were not based on the mode of analysis that *Bruen* rejected. This Court thus must follow those Sixth Circuit precedents unless or until the Sixth Circuit or the Supreme Court overrules them.

---

[2]     The government is aware of only five district court to have dismissed a Section 922(g)(1) indictment based on a Second Amendment challenge. *United States v. Freeman*, __ F. Supp. 3d __, 2023 WL 7325934 (N.D. Ill. Nov. 7, 2023); *United States v. Harper*, No. 1:21CR236, 2023 WL 5672311 (M.D. Penn. Sept. 1, 2023) (relying on *Range II*, discussed below); *United States v. Quailes*, __ F. Supp. 3d __, 2023 WL 5401733 (M.D. Penn. Aug. 22, 2023) (same); *United States v. Forbis*, No. 4:23CR133 (N.D. Okla. Aug. 17, 2023); *United States v. Bullock*, __ F. Supp. 3d __, 2023 WL 4232309 (S.D. Miss. June 28, 2023). Also, in a civil declaratory-judgment action, one circuit court has declared Section 922(g)(1) invalid as applied to a particular person who had been convicted of a non-violent state-law misdemeanor involving making a false statement to obtain food stamps. *Range v. Att'y General of the U.S.*, 69 F.4th 96 (3d Cir. 2023) (*en banc*) ("*Range II*"). The government has recently sought Supreme Court review of *Range II*. *See Garland v. Range*, No. 23-__ (U.S.).

Second, felon-dispossession laws are constitutionally valid under *Bruen* because the Second Amendment's text, history, and tradition all support the ability of Congress to disarm individuals who are not law-abiding, responsible citizens.

Third and finally, Section 922(g)(1) is at the very least constitutional as applied to Sanchez, given his dangerous criminal history, which also precludes him from bringing a facial challenge.

## II.    *BRUEN* DOES NOT REQUIRE THIS COURT TO DISMISS THE INDICTMENT

### A.    Because the Sixth Circuit has held multiple times in published opinions since *Heller* that Section 922(g)(1) is constitutional, this Court should deny Sanchez's motion to dismiss the indictment based on that binding precedent.

Since *Heller* and relying on *Heller*'s language about the presumptive constitutionality of felon-dispossession laws, the Sixth Circuit has held—multiple times—that Section 922(g)(1) is constitutional, in both published and unpublished decisions.  *See, e.g.*, *United States v. Goolsby*, No. 21-3087, 2022 WL 670137, at *3 (6th Cir. Mar. 7, 2022); *Stimmel v. Sessions*, 879 F.3d 198, 203 (6th Cir. 2018); *United States v. Swaggerty*, No. 16-6677, 2017 WL 11622737, at *1 (6th Cir. Oct. 18, 2017); *Greeno*, 679 F.3d at 517; *United States v. Whisnant*, 391 F. App'x 426, 430 (6th Cir. 2010); *Carey*, 602 F.3d at 740-41; *United States v. Khami*, 362 F. App'x 501, 507-08 (6th Cir. 2010); *United States v. Frazier*, 314 F. App'x 801, 807 (6th Cir. 2008).

*Bruen* did not call these Sixth Circuit holdings into question.  In *Bruen*, the Supreme Court held the Second Amendment protects the right of "ordinary, *law-abiding* citizens" to "carry a handgun for self-defense outside the home."  142 S. Ct. at 2122 (emphasis added).  The Court struck down a New York law requiring residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] *law-abiding* citizens with ordinary self-defense needs from exercising their right to keep and bear arms."  *Id.* at 2122, 2156 (emphasis added).  In doing so, *Bruen* rejected the "two-step" framework adopted by most

6

courts of appeals (including the Sixth Circuit) after *Heller* that "combine[d] history with means-end scrutiny." *Id.* at 2125-26.  It observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 2127.  But the Court "decline[d] to adopt" the second step of that framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126-27.

*Bruen* "reiterate[d]" the "standard for applying the Second Amendment." 142 S. Ct. at 2129.  First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30.  Second, when a regulation burdens such conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

The Sixth Circuit's holdings upholding Section 922(g)(1) are consistent with the text-and-history analysis that *Bruen* requires.  Those holdings did not rely on the kind of means-end scrutiny that *Bruen* rejected, but instead relied on *Heller*'s statements that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful," 554 U.S. at 626-27 & n.26, and that the Second Amendment protects the rights of "law-abiding, responsible citizens," *id.* at 635.  *See, e.g.*, *Stimmel*, 879 F.3d at 203; *Carey*, 602 F.3d at 740-41.

As noted above, *Bruen* does not call those statements in *Heller* into question.  Indeed, a majority of the Justices wrote separately to confirm this.  Justice Alito explained in his *Bruen* concurrence that the majority opinion did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* … about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring).  Similarly, Justice Kavanaugh, joined by Chief Justice Roberts, emphasized that "the Second Amendment allows a 'variety' of gun regulations"

and reiterated *Heller*'s statement about not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons."  *Id.* at 2162 (Kavanaugh, J., concurring) (citations omitted).  And Justice Breyer in dissent, joined by Justices Kagan and Sotomayor, agreed with Justice Kavanaugh on that point.  *Id.* at 2189 (Breyer, J., dissenting).  In sum, five current Justices wrote or joined separate writings in *Bruen* noting that *Bruen*'s majority decision did not disturb *Heller*'s and *McDonald*'s earlier statements about felon-dispossession laws.

While it is true in the abstract that *Heller*'s and *McDonald*'s statements about felon-dispossession statutes did not, standing on their own, preclude all future constitutional scrutiny of such statutes, *see Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 686-87 (6th Cir. 2016) (*en banc*), the critical point is that the Sixth Circuit has scrutinized Section 922(g)(1) since *Heller* and found the statute to be constitutional.  Those Sixth Circuit holdings survive *Bruen*, for at least two reasons.  First, as mentioned already, those holdings did not rely on the second-step analysis that *Bruen* found to be invalid.  *Cf. United States v. Sitladeen*, 64 F.4th 978, 985-86 (8th Cir. 2023) (similarly holding that *Bruen* did not abrogate a pre-*Bruen* panel's holding that "unlawfully present aliens are not within the class of persons to which the phrase 'the people' refers" because that panel did not rely on the invalid second-step analysis).  And second, unlike laws like Section 922(g)(1) that dispossess felons, the New York scheme in *Bruen* burdened the firearm-carry rights of "ordinary, law-abiding, adult citizens." *Bruen*, 142 S. Ct. at 2134. *Bruen*'s exhaustive historical analysis on behalf of law-abiding citizens challenging a statute to which *Heller* did not afford a presumption of constitutionality does not suggest that such an inquiry is necessary on behalf of felons challenging a law such as Section 922(g)(1), which the Supreme Court had already held was presumptively constitutional.

Under Sixth Circuit precedent rules, the Sixth Circuit's published decisions "remain[] controlling" unless or until "an inconsistent decision of the United States Supreme Court requires modification … or [the Sixth Circuit] sitting *en banc* overrules the prior decision." *Salmi v. Sec'y of Health and Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (citation omitted; italics added); *see also, e.g.*, *United States v. Brown*, 957 F.3d 679, 683-84 (6th Cir. 2020) (defendant challenging binding Sixth Circuit precedent "should direct his argument to [the] *en banc* [Sixth Circuit] or the Supreme Court").  By implication, where a Supreme Court decision abrogates only a portion of the Sixth Circuit's precedent, the rest of that precedent remains good law unless or until the *en banc* Sixth Circuit or the Supreme Court changes it.  *See United States v. Cavazos*, 950 F.3d 329, 336 (6th Cir. 2020).

Here, *Bruen* abrogated only the second, means-end-scrutiny step of the Sixth Circuit's framework.  It thus did not call into question the Sixth Circuit's earlier holdings that felon-dispossession laws are consistent with the Second Amendment under the first, non-abrogated step of the Sixth Circuit's pre-*Bruen* framework.  Indeed, for this very reason, the Tenth Circuit in a unanimous published opinion recently adhered to its prior precedents that had relied on *Heller*'s language that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," and that felon-dispossession statutes are "presumptively lawful."  *See Vincent v. Garland*, __ F.4th __, 2023 WL 5988299, at *3 (10th Cir. Sept. 15, 2023).

Because the Sixth Circuit's holdings cited above remain good law and squarely foreclose Sanchez's claim, this Court should not dismiss Sanchez's indictment.  This Court should leave it to the Sixth Circuit or the Supreme Court to decide whether to revisit those precedents after *Bruen*.  *Cf., e.g.*, *United States v. Mosely*, Crim. No. H-22-620, 2023 WL 4765596, at *3 (S.D.

Tex. July 26, 2023) ("The Fifth Circuit may choose to revisit its [Section] 922(g)(1) jurisprudence if given the opportunity.  But its existing precedents bind this Court.  Those precedents affirm the constitutionality of [Section] 922(g)(1).").

> **B.** **Even if this Court was writing on a blank slate, felon-dispossession laws are constitutionally valid after *Bruen*, so this Court should reject Sanchez's constitutional arguments on the merits if it decides to reach them.**

Even if *Bruen* required this Court to consider Section 922(g)(1)'s constitutionality afresh—which it does not—Sanchez could not prevail.

> 1. The Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Amendment guarantees an individual right to possess and carry arms for self-defense.  But as the Supreme Court has repeatedly emphasized, "the right secured by the Second Amendment is not unlimited."  *Heller*, 554 U.S. at 626; *see Bruen*, 142 S. Ct. at 2128; *McDonald*, 561 U.S. at 786 (plurality op.).  In determining the scope of the right to keep and bear arms, a court should consider the right's history and the Nation's tradition of firearms regulation.  *See Bruen*, 142 S. Ct. at 2126.  History and tradition establish, for example, that the Second Amendment does not guarantee an unlimited right to possess every kind of weapon; rather, Congress may ban "dangerous and unusual weapons."  *Heller*, 554 U.S. at 627.  History and tradition similarly establish that the Amendment does not guarantee an unlimited right to carry weapons in every kind of place; rather, Congress may ban weapons in "sensitive places."  *Bruen*, 142 S. Ct. at 2133.  So too Congress may regulate who may possess weapons in the first place.  In particular, the Supreme Court's precedents have recognized that Congress may disarm individuals who are

not "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. The history of the right to keep and bear arms and the American tradition of firearms regulation confirm that reading.

i. <u>The Supreme Court's precedents recognize that Congress may disarm persons who are not law-abiding, responsible citizens.</u>

In *Heller*, the Supreme Court described the right to keep and bear arms as a "right of law-abiding, responsible citizens." 554 U.S. at 635. The Court also made clear that legislatures may adopt categorical prohibitions on the possession of arms by those who are not law-abiding and responsible, identifying "longstanding prohibitions on the possession of firearms by felons and the mentally ill" as "examples" of "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26. The plurality in *McDonald* similarly observed that the Second Amendment protects "the safety of … law-abiding members of the community." 561 U.S. at 790. And it repeated *Heller*'s "assurances" that the Amendment allows Congress to disarm felons and individuals with mental illnesses. *Id.* at 786.

*Bruen* reaffirmed that reading of the Second Amendment. The Supreme Court reiterated *Heller*'s and *McDonald*'s holding that the Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home." *Bruen*, 142 S. Ct. at 2122. And the Court agreed with the plaintiffs in that case that "ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense." *Id.* In all, the Court's opinion used the term

11

"law-abiding, responsible citizens" and its variants more than a dozen times to describe the Amendment's scope.[3] The concurrences reiterated the point.[4]

Many aspects of Second Amendment doctrine rest on the premise that the Amendment protects only law-abiding, responsible citizens. In judging whether a modern firearms regulation is consistent with a historical precursor, a court must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. In judging whether a weapon is dangerous and unusual, a court must consider whether the weapon is "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And States may require applicants for gun permits to pass background checks and take safety courses because such requirements ensure that those who carry guns "are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (citation omitted). Those legal principles all reflect the understanding that the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens.

Relatedly, the only post-*Bruen* Sixth Circuit decision to have considered a Second Amendment challenge to a federal firearm law rejected the challenge, and did so at least in part because *Bruen* "referred repeatedly to the rights of '*law-abiding* citizens.'" *See United States v.*

---

[3]    *See Bruen*, 142 S. Ct. at 2125 ("law-abiding, adult citizens"); *id.* at 2131 ("law-abiding, responsible citizens") (citation omitted); *id.* at 2133 ("a law-abiding citizen's right to armed self-defense" and "law-abiding citizens"); *id.* at 2134 ("ordinary, law-abiding, adult citizens"); *id.* at 2135 n.8 ("law-abiding citizens"); *id.* at 2138 ("law-abiding citizens"); *id.* at 2138 n.9 ("'law-abiding, responsible citizens'" and "ordinary citizens") (citation omitted); *id.* at 2149 ("the responsible") (citation omitted); *id.* at 2150 ("law-abiding citizens" and "responsible arms carrying"); *id.* at 2156 ("law-abiding, responsible citizens" and "law-abiding citizens").

[4]    *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("lawabiding residents"); *id.* at 2158 ("law-abiding citizens" and "[o]rdinary citizens"); *id.* at 2159 ("law-abiding person," "right of law-abiding people," "law-abiding New Yorker," and "ordinary person"); *id.* at 2161 ("right of ordinary law-abiding Americans"); *id.* at 2161 (Kavanaugh, J., concurring) ("ordinary, law-abiding citizens") (citation omitted).

*Burgess*, Nos. 22-1110 & 22-1112, 2023 WL 179886, at *5 (6th Cir. Jan. 13, 2023); *see also*

*Jackson*, 69 F.4th at 503 (noting "the Supreme Court's repeated statements in *Bruen* that the

Second Amendment protects the rights of a 'law-abiding citizen' to keep and bear arms").

ii.    History confirms that Congress may disarm persons who are not law-abiding, responsible citizens.

The Second Amendment's history illuminates its meaning.  *See Bruen*, 142 S. Ct. at

2128-29.  Because the Second Amendment "codified a right inherited from our English

ancestors," a court should begin with English law.  *Id.* at 2127 (citation omitted).  Because

"[c]onstitutional rights are enshrined with the scope they were understood to have when the

people adopted them," a court should also consider evidence of how the Founding generation

understood the right.  *Id.* at 2136 (citation and emphasis omitted).  And because evidence of the

"public understanding of a legal text in the period after its enactment or ratification" is probative

of original meaning, a court should consider how the Second Amendment was understood in the

19th century.  *Heller*, 554 U.S. at 605 (emphasis omitted); s*ee Bruen*, 142 S. Ct. at 2136-38.

Historical evidence from each of those eras—before, at, and after the Founding—leads to the

same conclusion: Congress may disarm persons who are not law-abiding, responsible citizens.

***Pre-Founding.***  Parliament first recognized a legal right to possess arms in the Bill of

Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.).  The Bill recited that King James II, who had been

deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants."  *Id.*

To prevent a repeat of that abuse, the Bill guaranteed that "the Subjects which are Protestants

may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Id.*

While the Bill of Rights condemned the disarming of "good subjects," it allowed the

disarming of irresponsible ones.  It thus did not displace the Militia Act of 1662, which

authorized local officials to disarm individuals they judged "dangerous to the Peace of the

13

Kingdome." 14 Car. 2, c. 3, § 13 (Eng.).  Consistent with the Militia Act, the Crown often

directed local officials to disarm those whom it did not trust to use weapons responsibly—for

instance, those who had "disturbed the public Peace."[5]  That practice continued after the English

Bill of Rights was adopted.[6]  Indeed, many 18th-century justice-of-the-peace manuals recognized

that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[7]

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed"

punishable by forfeiture of the offender's "armor."  2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 142

S. Ct. at 2139-42.  Leading 18th-century scholars agreed that the Statute forbade carrying

weapons in a terrifying manner, and that it made violations punishable by forfeiture of the

---

[5] Privy Council to Lord Newport (Jan. 8, 1661), *in Transactions of the Shropshire Archaeological and Natural History Society*, pt. 2, 3d ser., vol. 4, at 156 (1904); *see, e.g.*, *Calendar of State Papers, Domestic Series, Charles II, 1661-1662*, at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861) (instructions to "cause good watch to be kept in the highways" and to disarm "such as travel with unusual arms at unseasonable hours"); *Calendar of State Papers, Domestic Series, 1670*, at 237 (May 26, 1670) (Mary Anne Everett Green ed., 1895) (instructions to disarm "dangerous and disaffected persons"); *Calendar of State Papers, Domestic Series, May 1,1684–February 5, 1685,* at 26 (May 20, 1684) (F.H. Blackburne Daniell & Francis Bickley eds., 1938) (instructions to dispose of arms seized from "dangerous and disaffected persons").

[6] *See, e.g.*, *Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700–8 March, 1702*, at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (similar).

[7] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); *see, e.g.*, Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

weapons.[8]  The Statute thus allowed the government to disarm persons whose conduct revealed their unfitness to carry arms.

The understanding that the government could lawfully disarm irresponsible subjects remained intact at the time of the American Revolution, as one widely discussed episode illustrates.  In 1780, London officials reacted to widespread rioting by confiscating the rioters' arms.  *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-31 (1994).  The House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights.  *See id.* at 131-132.  Members defended the confiscation on the ground that it applied only to the "disorderly" "mob," not to "sober citizens" or "citizens of character."[9]  The press similarly distinguished "the riotous mob" from "citizens of character."[10]  And private groups that supported the right to bear arms warned that the confiscation did not set a precedent for disarming "peaceable Subjects."[11]

In short, although the English Bill of Rights secured a right to possess arms, the government could (and did) disarm those who could not be trusted to use arms lawfully and

---

[8]     *See, e.g.*, 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787); 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

[9]     *See, e.g.*, 21 *The Parliamentary History of England, from The Earliest Period to the Year 1803*, at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780) (defending disarmament of the "mob"); *id.* at 730-731 (June 21, 1780) (speech of Lord Stormont) (distinguishing "disorderly" persons from "sober citizen[s]").

[10]     49 *The London Magazine or Gentleman's Monthly Intelligencer* 518 (Nov. 1780); see, *e.g.*, 42 *The Scots Magazine* 419 (Aug. 1780) (distinguishing "suspicious persons" from "reputable citizens").

[11]     *See* 2 *The Remembrancer; or, Impartial Repository of Public Events, for the Year 1780*, at 139 (1780) (resolutions adopted in York); 1 *The Remembrancer; or Impartial Repository of Public Events, for the Year 1781*, at 24 (1780) (resolutions adopted in Middlesex); *id.* at 112 (resolutions adopted in Huntingdonshire).

responsibly.  Because the English right "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, that background strongly suggests that the Second Amendment likewise allows Congress to disarm individuals who are not law-abiding, responsible citizens.

*Founding era.*  Many precursors to the Second Amendment described the class of persons entitled to keep and bear arms using synonyms for "law-abiding, responsible citizens." In 1780, for example, the town of Williamsburg proposed amending the newly drafted Massachusetts constitution to provide that "the people have a right to keep and bear Arms for their Own and the Common defence."  *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966). The town explained: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Lawfull Subjects of Government* we Ought Never to be deprived of them."  *Id.* (emphasis added).

Anti-Federalists expressed a similar understanding of the right at Pennsylvania's ratifying convention.  They proposed a bill of rights that, among other things, forbade "disarming the people, or any of them, *unless for crimes committed, or real danger of public injury from individuals*."  2 *The Documentary History of the Ratification of the Constitution* (*Documentary History*) 598 (Merrill Jensen ed., 1976) (emphasis added); *see United States v. Skoien*, 614 F. 3d 638, 704 (7th Cir. 2010) (*en banc*), *cert. denied*, 562 U.S. 1303 (2011).  The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624, which was widely read and proved "highly influential," *Heller*, 554 U.S. at 604.  A contemporary commentator, discussing the proposal, agreed that Congress should have the power to disarm individuals who posed a "real danger of public injury."  Nicholas

Collin, *Remarks on the Amendments to the Federal Constitution … by a Foreign Spectator*, No. 11 (Nov. 28, 1788), *in Three Neglected Pieces of the Documentary History of the Constitution and Bill of Rights* 40 (Stanton D. Krauss ed., 2019).

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms."  6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added).  A contemporary described the proposal as an effort to protect "the right of *peaceable citizens* to bear arms."  Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), *in* 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001) (emphasis added).  The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it.  *Id.*

Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning.  *See Heller*, 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal").  The Second Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope.  *Id.* at 603-05.  The precursors discussed above reveal a common conception that the government may disarm those who are not law-abiding, responsible citizens.

***Post-Founding.***  Antebellum commentators shared the Founding generation's understanding of the Second Amendment's scope.  Not every commentator who discussed the right specifically addressed the government's power to disarm certain individuals—just as not every commentator specifically discussed its power to prohibit dangerous and unusual weapons

or to bar carrying weapons in sensitive places.  But the commentators that did address the issue confirmed that the government may disarm those who are not responsible or law-abiding.

For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, *if he demeans himself peaceably*, is not to be disarmed."  John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added).  "Thus are the rights of self defence guarded and secured," he added, "to every one *who entitles himself by his demeanor* to the protection of his country."  *Id.* (emphasis added).  A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms."  *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1.  And Joseph Gales, a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?"  Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early Indiana Trials and Sketches* 466-467 (1858).

Opponents of slavery voiced similar views during the Bleeding Kansas conflict of the mid-1850s.  On the one hand, they supported disarming groups responsible for violence in Kansas.  Senator (and future Vice President) Henry Wilson, for instance, complained that "armed bandits" were "violating law, order, and peace," and called for legislation "to disarm any armed bands, from the slave States or the free States, who enter the Territory for unlawful purposes."  Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856).  Senator Benjamin Wade likewise called on Congress to "[d]isarm these lawless bands."  *Id.* at 1091.  On the other hand, opponents

18

of slavery criticized Kansas authorities for disarming "peaceable" free-state settlers.[12]  A petition published in William Lloyd Garrison's newspaper even urged the impeachment of President Pierce for his efforts to disarm "peaceable citizens."  A.J. Grover, *Impeachment of Franklin Pierce* (Aug. 1, 1856), *in* The Liberator, Aug. 22, 1856, at 140.

Sources from during the Civil War reflect the same understanding.  In 1863, a Union general ordered that "all loyal and peaceable citizens in Missouri will be permitted to bear arms." Hdqrs. Dep't of the Missouri, General Orders, No. 86 (Aug. 25, 1863), *in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, ser. 1, vol. 22, pt. 2, at 475 (1888).  A war memoir recounted a Union soldier's belief that "it was unconstitutional to disarm peac[e]able citizens."  *Chickasaw, The Scout*, *in* R.W. Surby, *Grierson Raids* 253 (1865).  And after the war, Senator Henry Wilson defended Congress's "power to disarm ruffians or traitors, or men who are committing outrages against law or the rights of men."  Cong. Globe, 39th Cong., 1st Sess. 915 (1866).

As Reconstruction began, many southern States sought to disarm Black citizens, prompting "an outpouring of discussion" about the right to keep and bear arms.  *Heller*, 554 U.S. at 614.  Participants in that discussion affirmed the right to possess arms for self-defense, yet cautioned that the right protected only "peaceable" or "well-disposed" citizens.  In Georgia, for example, the Freedmen's Bureau issued a circular explaining that "[a]ll men, without distinction of color, have the right to keep arms," but that "[a]ny person, white or black, may be disarmed if

---

[12]    *See, e.g.*, New-York Daily Tribune, Oct. 2, 1856, at 4 ("When [a Kansas official] entered the houses of peaceable citizens and demanded that they should deliver up their arms, he … violated one of those provisions of the Constitution which a free people should guard with the most jealous care."); *High-Handed Outrage in Kansas*, Holmes County Republican, Oct. 30, 1856, at 1 (denouncing the disarmament of "[p]eaceable American [c]itizens" in Kansas as a violation of their "constitutional rights").

convicted of making an improper and dangerous use of arms." H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. 65 (1866). The Bureau also recognized that the "freedmen of South Carolina have shown by their peaceful conduct that they can safely be trusted with fire-arms." H.R. Rep. No. 30, 39th Cong., 1st Sess. Pt. II, 229 (1866). And a Reconstruction order guaranteed the "constitutional rights of all loyal and well-disposed inhabitants" in South Carolina, but added that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. at 908-09.

Commentators continued to interpret the Second Amendment the same way later in the century. One newspaper article argued that "pistols cannot safely be committed to every irresponsible hand," that the Constitution does not protect "the right of every drunken loafer to bear about in his pocket the implements of murder," and that the right instead belongs only to those "whom it was safe to trust with firearms." *The Sale of Pistols*, New York Times, June 22, 1874, at 4. Another article referred to the "constitutional right of every peaceable citizen to carry arms for his own defense." *Kansas Legislature: Some Criticisms on Pending Bills*, The Topeka Daily Capital, Feb. 2, 1883, at 6.

All in all, post-ratification sources point in the same direction as English and Founding Era sources. Although different commentators used different terms—"peaceable," "well-disposed," and so on—they recognized that a legislature could disarm those who were not law-abiding, responsible citizens.

        iii.   <u>The Nation has a long tradition of disarming persons who are not law-abiding, responsible citizens.</u>

"[T]his Nation's historical tradition of firearm regulation" further illuminates the Second Amendment's scope. *Bruen*, 142 S. Ct. at 2126. And the United States has a longstanding tradition, dating to colonial times and continuing to the present, of disarming persons whom

legislatures have found are not law-abiding, responsible citizens.  Most relevant here, early American legislatures denied arms to classes of individuals considered unfit to possess them. When the Revolutionary War began, for example, the Continental Congress recommended, and most States enacted, laws disarming loyalists and others who refused to swear allegiance to the new Republic.[13]  Similarly, after putting down Shays' Rebellion in 1787, Massachusetts required the rebels, as a condition of being pardoned, to surrender their arms, which would be returned to them after three years if they kept the peace.[14]  Early American legislatures likewise denied arms to other classes of individuals deemed to be categorically unfit to possess them, albeit on bases that would be unconstitutional today for other constitutional reasons.[15]  Still, these laws demonstrate that colonial legislatures "had the power and discretion to use status as a basis for

---

[13]     See 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821).

[14]     See Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147 (1805).

[15]     For example, "several colonies enacted complete bans on gun ownership by slaves and Native Americans," based on "alienage or lack of allegiance to the sovereign."  *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (quotations omitted).  And during the French and Indian War, Virginia passed a law disarming Catholics that allowed them to keep their arms if they swore an oath of allegiance to the king.  7 Statutes at Large; Being A Collection of All the Laws of Virginia 35-36 (1820) (1756 law).

disarmament" even of non-violent groups.  *Range v. Att'y Gen'l of the U.S.*, 53 F.4th 262, 276 n.18 (3d Cir. 2022) ("*Range I*"), *vacated by Range II*, 69 F.4th 96.[16]

Colonies and early States also punished irresponsible use of arms with forfeiture of the arms.  Early American justice-of-the-peace manuals explained that the Statute of Northampton— which the colonies inherited along with other pre-colonization statutes, *see Patterson v. Winn*, 5 Pet. 233, 241 (1831)—empowered justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.[17]  Some 17th- and 18th-century American statutes expressly recodified that rule.[18]  Others made forfeiture part of the penalty for offenses such as unsafe storage of guns or gunpowder.[19]  Although those laws involved forfeiture of arms involved in an offense, rather than bans on possessing arms, they show that legislatures could

---

[16]     Although *Range I* is no longer the law in the Third Circuit, this Court nevertheless may treat its analysis as persuasive authority, just as it may do so with other non-binding judicial analyses.

[17]     *See*, *e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[18]     *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[19]     *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland, 1638-1674*, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210 (1906).

restrict an individual's ability to bear arms if his conduct suggested that he would not use them responsibly.

A few decades later, States began to adopt surety statutes that required certain potentially irresponsible individuals who carried firearms to post bond. *See Bruen*, 142 S. Ct. at 2148. The earliest such statute, enacted by Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense. Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions adopted variants of that law later in the 19th century. *See Bruen*, 142 S. Ct. at 2148 n.23 (collecting statutes). Those laws, too, confirm that irresponsible individuals were subject to special restrictions that did not (indeed, could not) apply to ordinary, law-abiding citizens. *See id.* at 2122 (holding a proper-cause requirement unconstitutional as applied to ordinary citizens).

Continuing in the 19th century, as guns became more lethal and more widely available, legislatures disarmed a range of individuals whom they deemed unfit to carry firearms. At least 29 jurisdictions banned or restricted the sale of firearms to, or the possession of firearms by, individuals below specified ages.[20] Several States banned the sale of guns to persons of unsound

---

[20]     *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn.

mind.[21]  At least a dozen States disarmed "tramps"—that is, vagrants.[22]  Some States forbade

intoxicated persons from buying or carrying guns.[23]  One State forbade the carrying of arms by

"any person who has ever borne arms against the government of the United States."[24]  Another

disarmed certain individuals in identified categories if they were "not known to be peaceable and

quiet persons."[25]

     State courts upheld such laws on the ground that the disqualified individuals were apt to

use arms irresponsibly.  The Missouri Supreme Court, for example, upheld a ban on carrying

arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be

apprehended from an intoxicated person going abroad with fire-arms."  *State v. Shelby*, 2 S.W.

468, 469 (1886).  And the Ohio Supreme Court explained that a law disarming "tramps" was

---

Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[21]     *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[22]     *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[23]     *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

[24]     *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25.

[25]     *See* Act of Apr. 30, 1855, §§ 1-2, *in* 2 *The General Laws of the State of California, from 1850 to 1864, inclusive* 1076-1077 (Theodore H. Hitchell ed., 1865).

consistent with the right to keep and bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (1900).

The tradition of disarming unfit persons continued into the 20th century.  In the 1930s, Congress disqualified violent criminals, fugitives from justice, and persons under felony indictment.  *See* Federal Firearms Act, ch. 850, § 2(d)-(f), 52 Stat. 1251.  In the 1960s, Congress disqualified felons in general, drug users and addicts, and persons with mental illnesses.  *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757; Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1220.  In the 1980s, Congress disqualified noncitizens who are unlawfully present in the United States and persons who have been dishonorably discharged from the Armed Forces.  *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 102(5)(D), 100 Stat. 452.  And in the 1990s, Congress disarmed persons subject to domestic-violence protective orders, *see* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110401(c), 108 Stat. 2014, and domestic-violence misdemeanants, *see* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, Div. A, Tit. I, Sec. 101(f) [tit. VI, § 658(b)(2)], 110 Stat. 3009-372.  That series of statutes reflects Congress's longstanding judgment that "firearms must be kept away from persons … who might be expected to misuse them."  *Dickerson* v. *New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983).

From the earliest days of the Republic to modern times, in short, legislatures have disarmed individuals who could not be trusted with firearms.  Different legislatures have disarmed different groups at different times: loyalists and rebels in the 18th century; underage individuals and persons of unsound mind in the 19th century; and felons, drug addicts, and domestic abusers in the 20th century.  But those disqualifications all reflect the same enduring

25

principle:  The Second Amendment allows Congress to disarm individuals who are not law-abiding, responsible citizens.

        iv.    <u>The Nation also has a long tradition of subjecting felons to death, forfeiture, or the loss of other rights.</u>

In addition to the United States' longstanding tradition of disarming persons whom legislatures have found not to be law-abiding, responsible citizens, there is also a longstanding tradition of subjecting convicted felons to capital punishment, forfeitures of their property, and the loss of other rights.

For centuries, felonies have been "the most serious category of crime." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).  In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769).  Blackstone observed that "[t]he idea of felony is so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98 (capitalization omitted).

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding.  *Folajtar v. Att'y Gen'l of the U.S.*, 980 F.3d 897, 904-05 (3d Cir. 2020), *abrogated in part by Bruen*, 142 S. Ct. 2111.  Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'"  *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)).  Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, forging or counterfeiting a public security, and piracy on the high seas.  *See* An Act for the Punishment of

Certain Crimes Against the United States, 1 Stat. 112-15 (1790). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

A few examples demonstrate the severe consequences of committing a felony at the time. In 1788, just three years before the Second Amendment's ratification, New York passed a law providing for the death penalty for crimes such as burglary, robbery, arson, malicious maiming and wounding, and counterfeiting. 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 664-65 (1886). The act established that every person convicted of an offense making the person "liable to suffer death, shall forfeit to the people of this State, all his, or her goods and chattels, and also all such lands, tenements, or hereditaments" the person possessed "at the time of any such offence committed, or at any time after." *Id.* at 666. For all other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense or felony committed after such first conviction" was "death." *Id.* at 665.

Two years earlier, New York had passed a law severely punishing counterfeiting of bills of credit. 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 260-61 (1886). The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and shall be committed to the bridewell [correction house] of the city of New York for life, and there confined to hard labor." *Id.* at 261. In addition, "to prevent escape," the defendant was to be "branded on the left cheek with the letter C, with a red hot iron." *Id.*

27

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which the legislature believed had previously "ha[d] not a punishment sufficiently exemplary annexed thereto." 9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302 (1821). The act stated that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years." Id. at 302-03.

Throughout the 1700s, other American colonies punished a variety of crimes with death, estate forfeiture, or both. For example, a 1700 Pennsylvania law provided that any person convicted of "wilfully firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives in the House of Correction at hard labor." 2 Statutes at Large of Pennsylvania from 1682 to 1801 at 12 (1896). A 1705 Pennsylvania law provided that a person convicted of rape "shall forfeit all his estate" if unmarried, and "one-third part thereof" if married, in addition to receiving 31 lashes and imprisonment for "seven years at hard labor." Id. at 178. A 1715 Maryland law provided that anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" that resulted in injury to another's estate or inheritance "shall forfeit all his goods and chattels, lands and tenements." 1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments 79 (1811). A 1743 Rhode Island law provided that any person convicted of forging or counterfeiting bills of credit "be adjudged guilty

of Felony" and "suffer the Pains of Death" and that any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony."  Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America 33-34 (1767).  And a 1750 Massachusetts law provided that rioters who refused to disperse "shall forfeit all their lands and tenements, goods and chattles [sic]," in addition to receiving 39 lashes and one year's imprisonment.  3 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 545 (1878).

Aside from death and forfeiture, there is also a longstanding history and tradition of subjecting convicted felons to the loss of other rights, even fundamental ones.  As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State … cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds," Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1st ed. 1868).  Felons could therefore historically be excluded from "exercis[ing] the elective franchise," *id.* at 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 (1998); *see also Green v. Bd. of Elections of City of N.Y.*, 380 F.2d 445, 450 (2d Cir. 1967) ("eleven state constitutions adopted between 1776 and 1821 prohibited or authorized the legislature to prohibit exercise of the franchise by convicted felons").  Indeed, it remains the case today that "[t]he commission of a felony often results in the lifelong forfeiture of a number of rights" tied to membership in the

political community, including "the right to serve on a jury and the fundamental right to vote." *Medina,* 913 F.3d at 160.

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Id.* at 158; *accord Jackson*, 69 F.4th at 503-04.  At the very least, this history and tradition shows that, since the Founding and before, there has been a shared understanding that legislatures could impose the loss of even fundamental rights to persons who had been convicted of felonies.

2.    <u>Section 922(g)(1) complies with the Second Amendment.</u>

This case concerns Congress's power to disarm those who are neither "law-abiding" nor "responsible."  In this context, a person is not "law-abiding" if he has committed at least one felony or other offense punishable by more than one year's imprisonment.  And a person is not "responsible" if his possession of a firearm would pose a danger of harm to himself or others.

That understanding of who is not a "responsible" citizen is consistent with the history recounted above:  English law allowed the disarmament of dangerous individuals; an influential Second Amendment precursor contemplated the disarmament of individuals who posed a "real danger of public injury;" 19th century sources recognized legislatures' power to disarm individuals whose possession of arms would endanger the public; and American legislatures have been disarming such individuals since the 17th century.  Members of the Supreme Court have also recognized that, whatever the outer limits of Congress's power to disqualify categories of persons from possessing arms, Congress may at least disarm "dangerous individuals," *NYSRPA*, 140 S. Ct. at 1541 (Alito, J., dissenting), or individuals "who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety," *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting).  And as discussed

30

above, both the Supreme Court and a majority of its current members in separate writings have made clear that felons are among the dangerous, non-law-abiding people who may be disarmed.

Finally, in exercising its authority to disarm individuals who are not law-abiding, responsible citizens, Congress need not require case-by-case findings of dangerousness. Congress may make categorical judgments about who are not law-abiding, responsible citizens: "That *some* categorical limits are proper is part of the original meaning" of the Second Amendment. *Skoien*, 614 F.3d at 640. And in enacting Section 922(g)(1), "Congress acted within the historical tradition" of "employ[ing] status-based restrictions to disqualify certain categories of persons from possessing firearms." *Jackson*, 69 F.4th at 505.

Judged against this history and tradition, Section 922(g)(1) complies with the Second Amendment. Because persons who are felons are not law-abiding, responsible citizens, the Second Amendment allows Congress to disarm them.

### 3. Contrary arguments lack merit.

Sanchez's contrary arguments, and other typical arguments in cases like his, lack merit.

#### i. Congress may disarm felons even if they are among "the people."

There is some debate about whether felons fall within the meaning of "the people" reference in the Second Amendment. *Compare, e.g.*, *Range II*, 69 F.4th at 101-03, *with, e.g.*, *Tyler*, 837 F.3d at 708 (Sutton, J., concurring in most of the judgment) (felons are an "exception" to the class of "American citizens" who have "a fundamental right … to possess a gun"). But Congress's ability to disarm felons does not depend on felons not being part of "the people."

The Bill of Rights secures rights "inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions." *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897). "In incorporating these principles into the fundamental law there was no intention of disregarding the exceptions, which continued to be recognized as if

31

they had been formally expressed." *Id.*  The First Amendment, for example, allows legislatures to ban true threats, even though a threat is a form of "speech."  *See Counterman* v. *Colorado*, 143 S. Ct. 2106, 2114 (2023).  And the Second Amendment allows legislatures to ban dangerous and unusual weapons, such as short-barreled shotguns, even though they are "arms."  *See Heller*, 554 U.S. at 624-625.  So too, history and tradition establish that the Second Amendment allows legislatures to disarm persons who are not law-abiding, responsible citizens, regardless of whether they are among "the people."

This does not mean that there is no limiting principle.  The "law-abiding, responsible citizens" principle no more allows Congress to disarm anyone it pleases than the sensitive-places doctrine allows Congress to ban guns anywhere it pleases.  *See Bruen*, 142 S. Ct. at 2133.  Rather, the Supreme Court's references to "law-abiding" and "responsible" citizens reflect the Second Amendment's history and tradition discussed above and exclude only criminals and individuals whose possession of firearms would endanger themselves or others (such as underage individuals, persons with mental illnesses, drug users, and persons subject to protective orders).

ii.  <u>Congress may disarm felons even if the Founders did not.</u>

The Supreme Court's precedents make clear that a modern firearm regulation can comply with the Second Amendment even if it lacks "a historical twin."  *Bruen*, 142 S. Ct. at 2133 (emphasis omitted).  For example, although "the historical record yields relatively few 18th- and 19th-century 'sensitive places'"—for example, "legislative assemblies, polling places, and courthouses"—the Second Amendment allows "modern regulations prohibiting the carry of firearms in new and analogous sensitive places."  *Id.* at 2133.  Relatedly, the Court has dismissed, as "bordering on the frivolous," the argument that the Amendment protects "only those arms in existence in the 18th century."  *Heller*, 554 U.S. at 582.  The notion that the Second Amendment permits only regulations that existed in the 18th or 19th century has no more

merit.  *Cf. McIntyre* v. *Ohio Elec. Comm'n*, 514 U.S. 334, 373 (1995) (Scalia, J., dissenting) ("Quite obviously, not every restriction upon expression that did not exist in 1791 or 1868 is *ipso facto* unconstitutional.").

The argument that Congress may not disarm felons if the Founders did not also conflicts with common sense.  Past lawmakers' failure to adopt a given regulation does not necessarily (or even ordinarily) reflect doubts about its constitutionality.  The idea of adopting such a regulation may never have occurred to the lawmakers.  Or they may have considered the regulation unnecessary, impractical, or politically inexpedient.  Or they may have failed to act because of the "sluggishness of government, the multitude of matters that clamor for attention, and the relative ease with which men are persuaded to postpone troublesome decisions."  *Duckworth v. Arkansas*, 314 U.S. 390, 400 (1941) (Jackson, J., concurring in result); *see Zuber v. Allen*, 396 U.S. 168, 185 n.21 (1969) ("Congressional inaction frequently betokens unawareness, preoccupation, or paralysis."); *see also United States v. Kelly*, No. 3:22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) (a "list of the laws that *happened to exist* in the founding era is … not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution").

It has been argued by some that the Founders *could have* disarmed felons, but that their mere failure to do so deprived future legislatures from taking that same permissible action.  *Bruen* does not go that far.  An absence of a history of similar regulations may be "relevant" to the Second Amendment inquiry.  *Bruen*, 142 S. Ct. at 2131.  But the Supreme Court has never treated it as dispositive.  Instead, both *Bruen* and *Heller* looked for historical authorities that

invalidated or disapproved analogous historical regulations "on constitutional grounds." *Id.*; see *id.* at 2145-2147; *Heller*, 554 U.S. at 629.  Sanchez has not cited any such authorities here.

        iii.    <u>Any argument requiring the government to identify a historical twin misunderstands the historical inquiry required by the Supreme Court's precedents.</u>

Relatedly, the two outlier decisions reasoned that the government had failed to identify an adequate historical analogue to Section 922(g)(1).  *See Range II*, 69 F.4th at 103-06; *Bullock*, 2023 WL 4232309, at *31.  But the analysis of those decisions is flawed on multiple levels.

Those decisions erred in reducing the Second Amendment inquiry to a search for a specific historical analogue.  "The test [the Supreme] Court set forth in *Heller* and [*Bruen*] requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."  *Bruen*, 142 S. Ct. at 2131.  That inquiry into original meaning "will often involve reasoning by analogy" to historical statutes, but it need not always do so.  *Id.* at 2132.  Here, the government has provided extensive evidence apart from historical analogues—for example, parliamentary and congressional debates, precursors to the Second Amendment, treatises, and commentaries—showing that the Second Amendment permits Congress to disarm persons who are not law-abiding, responsible citizens.

Moreover, this Court has emphasized that even when the government defends a modern law by invoking historical statutes, it need only cite a "historical *analogue*, not a historical *twin*."  *Bruen*, 142 S. Ct. 2133.  In judging whether a modern law is "analogous enough" to "historical precursors" to "pass constitutional muster," a court should ask whether the laws "impose a comparable burden" and are "comparably justified."  *Id.*  Here, the government has identified many historical laws that impose the same type of burden as Section 922(g)(1) (disqualifying someone from possessing arms) for the same type of reason (the person is neither law-abiding nor responsible enough to be trusted with arms).

Finally, a divide-and-conquer approach to the historical evidence is badly misguided. A court applying the Second Amendment should not isolate each historical precursor and ask if it differs from the challenged regulation in some way. A court should instead examine the historical evidence as a whole, determine whether it establishes a category of permissible regulation (such as "dangerous and unusual weapons" or "sensitive places"), and determine whether the challenged law fits in that category. The historical evidence here shows that the Second Amendment permits laws disarming persons who are not law-abiding, responsible citizens, and Section 922(g)(1) plainly qualifies as such a law.

**C.      This would be the wrong case to consider Section 922(g)(1)'s constitutionality as applied to non-violent felons because Section 922(g)(1) is, at the very least, constitutional as applied to Sanchez, given his dangerous criminal history, which also precludes a facial challenge to Section 922(g)(1).**

In any event, Section 922(g)(1) is constitutional as applied to those like Sanchez who are dangerous felons. To be sure, some judges (including now-Justice Barrett) and commentators have argued that the Second Amendment allows disarming only dangerous felons. *See Range II*, 69 F.4th at 104; *Kanter v. Barr*, 919 F.3d 437, 451, 454, 464 (7th Cir. 2019) (Barrett, J., dissenting); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 257-67, 285-86 (2020). That minority view is incorrect because, as discussed above, Congress may make categorical judgments about who are not law-abiding, responsible citizens, *Skoien*, 614 F.3d at 640, and "historical evidence and the Supreme Court's discussion of felon disarmament laws" indicate that Congress is not limited to making such categorical judgments only as to violent felons, *Medina*, 913 F.3d at 160; *United States v. Pruess*, 703 F.3d 242, 246 n.3 (4th Cir. 2012) (there is "substantial evidence that the Founders severely limited the right to bear arms, excluding from its protection a broad range

of often non-violent individuals and groups deemed 'dangerous'").  But regardless, Sanchez can constitutionally be disarmed on account of his felony status even under the minority view.

Even those who ascribe to the minority view do not argue that Congress cannot disarm dangerous felons.  For example, the *en banc* Third Circuit's majority stressed that its decision was "a narrow one," applying "only" to Bryan Range and his particular non-violent food-stamp-fraud felony-equivalent.  *Range II*, 69 F.4th at 106.  Even some of the concurring judges, who joined the majority's result for a non-violent misdemeanant, explained that Section 922(g)(1) "remains 'presumptively lawful'" because "it fits within our Nation's history and tradition of disarming those persons who legislatures believed would, if armed, pose a threat to the orderly functioning of society."  *Id.* at 109-10 (Ambro, J., concurring) (quoting *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring)).  Those concurring judges believed that "a sound basis exists for [Section] 922(g)(1)'s constitutional application in a substantial amount of cases," and thus "join[ed] the majority opinion with the understanding that it speaks only to [Range's] situation, and not to those of murderers, thieves, sex offenders, domestic abusers, and the like."  *Id.* at 110.  Other Third Circuit judges dissented because they would have upheld Section 922(g)(1) in its entirety, even as applied to non-violent felons.  *See id.* at 113-16 (Shwartz, J., dissenting); *id.* at 116-38 (Krause, J., dissenting); *id.* at 138-43 (Roth, J., dissenting).  Thus, it is unlikely that *Range II* would have come out the same way if the defendant challenging Section 922(g)(1), unlike Range, had been convicted of a violent felony.  At the very least, *Range II* by its own terms does not help anyone who has been convicted of a violent felony.

"[W]hether a government can forbid *violent* felons from possessing a firearm has not been meaningfully questioned by courts to date."  *United States v. Gonzalez*, No. 22-1242, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022) (unpublished) (finding that it would be

"frivolous" to argue that Section 922(g)(1) is unconstitutional as applied to someone convicted of a violent felony).  And Sanchez's criminal history contains multiple violent and dangerous felonies, including two convictions for felonious assault and one conviction for burglary, all of which categorically involve the immediate use, attempted use, or threatened of force against another.  As a result of his convictions, Sanchez thus cannot show that, even under the minority view, there would be anything unconstitutional about applying Section 922(g)(1) to him.  *Cf. Gonzalez*, 2022 WL 4376074, at *2 ("it would be frivolous to argue that [Section] 922(g)(1) is unconstitutional as applied to" a defendant who had been convicted of a violent felony).

For this same reason, Sanchez also cannot bring a facial challenge to Section 922(g)(1).  A facial challenge (outside the First Amendment context) can succeed only if the challenging party can show that there is no constitutional application of the statute.  *Coleman v. DeWitt*, 282 F.3d 908, 914 (6th Cir. 2002) (citing, *e.g.*, *United States v. Salerno*, 481 U.S. 739, 745-46 (1987)).

"Of course, there is a constitutional application of" Section 922(g)(1)—"[Sanchez]'s case," *id.*, not to mention the cases of every other dangerous felon whom all agree Congress can disarm.  Because of Sanchez's violent criminal history, he may not facially challenge Section 922(g)(1).  Indeed, now-Justice Barrett made this very point in *Kanter*: "violent felon[s]" are "in no position to challenge [Section] 922(g)(1) on the ground that its application to nonviolent felons is unconstitutional."  919 F.3d at 467 (Barrett, J., dissenting).

## III.     CONCLUSION

For the foregoing reasons, Sanchez's constitutional challenge to Section 922(g)(1) fails.

The United States therefore asks this Court to deny Sanchez's motion to dismiss the indictment.

Respectfully submitted,

Rebecca C. Lutzko
United States Attorney

By:     /s/ Scott Zarzycki
Scott Zarzycki (OH: 0072609)
Assistant United States Attorney
United States Courthouse
801 West Superior Avenue, Suite 400
Cleveland, OH  44113
(216) 622-3971
(216) 5227358 (facsimile)
Scott.Zarzycki@usdoj.gov